1
2
3
4
5
6
7

8           UNITED STATES DISTRICT COURT

9         SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11   MAHNAZ M., | Case No.:  22-cv-1729-BGS |
| 12                 Plaintiff, | |
| 13   v. | **ORDER REGARDING JOINT MOTION FOR JUDICIAL REVIEW [ECF NO. 20] AND AFFIRMING FINAL DECISION OF THE COMMISSIONER OF SOCIAL SECURITY** |
| 14   KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| 15 | |
| 16                 Defendant. | |

17

18      On November 4, 2022, Plaintiff Mahnaz M.[1] commenced this action against

19 Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, for judicial review

20 under 42 U.S.C. § 405(g) of a final adverse decision for a period of disability and

21 disability insurance benefits. (ECF No. 1.) On November 14, 2022, Plaintiff consented to

22 the undersigned's jurisdiction to conduct all proceedings in this case. (ECF No. 7.)[2]

23

24 [1] The Court refers to Plaintiff using only her first name and last initial pursuant to the
25 Court's Civil Local Rules. *See* S.D. Cal. Civ. R. 7.1(e)(6)(b).
26 [2] The United States has informed the Court of its general consent to Magistrate Judge
jurisdiction in cases of this nature. *See* S.D. Cal. Gen. Order No. 707 (Apr. 12, 2019).

27
28

1  Defendant filed the Administrative Record on March 17, 2023. (ECF No. 15.) On August
2  18, 2023, the parties filed a Joint Motion for Judicial Review of Final Decision of the
3  Commissioner of Social Security. (ECF No. 20.)

4      For the following reasons, the Court **AFFIRMS** the final decision of the
5  Commissioner.

6                              **I.     BACKGROUND**

7  **A.     Factual and Procedural History**

8      Plaintiff, who was born in 1971, previously worked as a health information
9  technician with Kaiser Permanente from 2001 to 2014, office clerk with Aerotek from
10 2014 to 2016, and clinical coordinator with Blue Shield of California from 2018 to 2019.
11 (AR 55-58, 186, 217.)[3] She was laid off from her position at Blue Shield on April 25,
12 2019, and collected unemployment benefits thereafter. (AR 58-59, 181.) On or about July
13 28, 2020, Plaintiff filed an application for disability insurance benefits under Title II of
14 the Social Security Act. (AR 139-44.) She alleged that she had been disabled since
15 October 27, 2019, due to post-traumatic stress disorder ("PTSD"). (AR 181.) Plaintiff's
16 application was denied on initial review and again on reconsideration. (AR 90-93, 95-99.)
17 An administrative hearing was conducted on May 20, 2021, by Administrative Law
18 Judge ("ALJ") Randolph E. Schum. (AR 48.) On July 29, 2021, the ALJ issued a
19 decision and concluded that Plaintiff was not disabled. (AR 32-43.) Plaintiff requested a
20 review of the ALJ's decision; the Appeals Council denied the request on September 8,

---

[3] "AR" refers to the Administrative Record filed on March 17, 2023. (ECF No. 15.) The
Court's citations to the AR use the page references on the original document rather than
the page numbers designated by the Court's case management/electronic case filing
system ("CM/ECF"). For all other documents, the Court's citations are to the page
numbers affixed by CM/ECF.

1   2022. (AR 1-6.) Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

2   (AR 245.)

3        Plaintiff provided the following explanation of her PTSD in a function report dated

4   November 1, 2020:

5        My PTSD which is from many physical, emotional[,] psychological and
         sexual abuse has made my life an absolute nightmare. I am living this

6        nightmare over & over. It's killing me slowly. I relive those events on a

7        daily basis. I have constant flashbacks. I have negative feelings, hard time to
         trust, holding on to jobs. My high general & social anxiety causing me so

8        much of physical reactions such as chronic cough for over 15 years, stomach
         & acid issues, allergy & asthma[,] urology issues, [rheumatology] issues &

9        much more.

10

11       . . . .

12

13       I come from a history of physical abuse by my uncle right after loss of my
         father (I was only 8 years old). Then I grew up with a very abus[ive],

14       [narcissistic] & neglectful mother. I've been forced to an awful marriage.
         The man who was physically, emotionally, sexually, financially abused me.

15       The worse was the time that he by manipulating the system legally took the
         custody of my only child. He destroyed my son's life as well—when finally

16       he lost the custody due to many situations (after 9 years), my son was
         involved in [the] wrong crowds & drug abuse. From that time I've been

17       emotionally abused by the system & his destructive path of living.

18

19   (AR 238, 245.)

20        Plaintiff's psychologist, Sean House, Ph.D., submitted a letter to the

21   Department of Social Services dated September 5, 2020. (AR 269.) The letter

22   stated:

23       I have [met] with [Plaintiff] in weekly pscyhotherapy since July 2019. To
         date, we have done 52 sessions. Her primary diagnosis is Post-Traumatic

24       Stress Disorder. She also experiences various degrees of anxiety and
         depression. [Plaintiff's] PTSD is characterized by interpersonal conflict, and

25       continued ruminations about various aspects of the past, including being set
         up for an arranged marriage by her mother, which resulted in an unhappy

26

27

28

22-cv-1729-BGS

1
2
3
4
5
6
7
8
9
10
11

marriage, abandonment by her family, moving from Iran to the United States with her husband and son. Being abandoned by her husband. Having her son become a victim of the family court system and legal system. Losing her rights as a parent until her son was 13. Having to raise a problematic teenager on her own, and seeing him descend into drug addiction and criminal behavior which resulted in his incarceration, and difficult interactions in the workplace. Client maintains a sense of being victimized and abandoned by everyone. Her attitude toward others is highly suspicious and judgmental, as she fears their judgment and being treated poorly by them. We have processed over a dozen negative interactions with various people that client has experienced in the past year. It is her highly dysfunctional interpersonal issues that makes her unlikely to be able to maintain a job. Client would like to be able to work, but does not believe that she will find a workplace that will treat her with basic dignity. Her interpersonal interactions are characterized by conflict, which will likely keep her from maintaining employment.

12

(*Id.*)

13
14
15
16
17
18

On September 18, 2020, state agency consultant Michael D'Adamo, Ph.D. observed, "[Plaintiff] has been treated on an [outpatient] basis since [July 2019]. A review of a sampling of [Dr. House's] notes revealed that [Plaintiff] is not suffering any severe psychopathology. She has plans to attend college. She is capable of adapting to jobs where the social demands are modest." (AR 72; *see also* AR 83 (same finding by state agency consultant R. Paxton, M.D. on reconsideration of Plaintiff's claim).)

19

**B.    ALJ's Decision**

20
21
22
23
24
25

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five steps). The ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since October 27, 2019, the alleged onset date. (AR 34.) He noted that Plaintiff received unemployment benefits

26
27
28

4

1    after being let go from her job. (*Id.*)[4] At step two, the ALJ found that Plaintiff's severe
2    impairments included post-traumatic stress disorder and an adjustment disorder with
3    anxiety. (*Id.*) The ALJ determined at step three that Plaintiff did not have an impairment
4    or combination of impairments that met or medically equaled a listed impairment. (AR
5    36.) He then found that Plaintiff retained the residual functional capacity ("RFC") to
6    perform a full range of work at all exertional levels but could have only "contact with
7    others [that is] casual and not more than occasional" and could not work in a setting that
8    includes "constant/regular public contact or more than occasional handling of customer
9    complaints." (AR 38.) At step four, the ALJ determined that Plaintiff was unable to
10   perform her past relevant work as a general clerk, medical records clerk, or quality
11   assurance coordinator because these jobs required "contact with others [that] was more
12   than occasional or casual." (AR 41.) At step five, the ALJ stated that Plaintiff was able to
13   perform the requirements of the representative occupations of marker, restaurant kitchen
14   helper, and grocery store bagger. (AR 42.) Accordingly, the ALJ found that Plaintiff had
15   not been under a disability from October 27, 2019, through the date of his decision. (*Id.*)

16   **C.    Disputed Issues**

17        The parties have briefed two issues in their joint motion which Plaintiff asserts are
18   grounds for reversal: (1) whether the ALJ properly considered Plaintiff's testimony and
19   (2) whether the ALJ gave germane reasons for rejecting lay witness testimony.

## II.    LEGAL STANDARDS

21        Section 405(g) of the Social Security Act allows unsuccessful applicants to seek
22   judicial review of a final agency decision of the Commissioner. 42 U.S.C. § 405(g). The

---

[4] Receipt of unemployment benefits can undermine a claimant's alleged inability to work full-time as it demonstrates that the claimant is holding herself out as available for work. *See Carmickle v. Comm'r*, 533 F.3d 1155, 1161-62 (9th Cir. 2008) (citing *Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988)).

22-cv-1729-BGS

scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'" *Brawner v. Sec'y of Health & Human Servs.*, 839 F.2d 432, 433 (9th Cir. 1988) (quoting *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Biestek v. Berryhill*, 587 U.S. ----, ----, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for . . . evidentiary sufficiency [under the substantial evidence standard] is not high."). The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions. *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020). The district court may affirm, modify, or reverse the Commissioner's decision. 42 U.S.C. § 405(g). The matter may also be remanded to the Social Security Administration for further proceedings. *Id.*

### III.   DISCUSSION

**A.   <u>Evaluation of Subjective Symptom Testimony</u>**

Plaintiff's first argument is that the ALJ failed to articulate clear and convincing reasons to discount her testimony regarding her subjective symptoms. (Joint Mot., ECF No. 20 at 4-16.) Defendant counters that the ALJ properly evaluated Plaintiff's alleged symptoms and found they were inconsistent with the objective medical evidence, Plaintiff's reported activities, and the opinions of two state agency consultants in the

record. (*Id.* at 18-24.) The Court finds that the ALJ properly discounted Plaintiff's testimony that her PTSD condition precluded her from working.

### 1.   Applicable standards

It is up to the ALJ "to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) (quoting *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014)). An ALJ engages in a two-step analysis to determine the extent to which a claimant's report of symptoms must be credited. First, the ALJ must decide whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Garrison*, 759 F.3d at 1014; *see also* SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017); 20 C.F.R. § 404.1529(b). Second, the ALJ evaluates the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the ability to perform work-related activities. SSR 16-3p, 2017 WL 5180304, at *3; 20 C.F.R. § 404.1529(c). When the ALJ finds that a claimant is not malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Garrison*, 759 F.3d at 1014-15; *see also Lambert*, 980 F.3d at 1277; *Smartt v. Kijakazi*, 53 F.4th 489, 497 (9th Cir. 2022). This requires the ALJ to "specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines that testimony." *Lambert*, 980 F.3d at 1277 (citing *Treichler*, 775 F.3d at 1102).

### 2.   Plaintiff's subjective symptom testimony

At the administrative hearing, Plaintiff provided the following testimony in response to the ALJ's inquiry about why she was unable to work:

> Because I can't; I applied many, many, many places although I didn't get it. Dealing with so many other things going on in my life. . . . So many particular things -- I have to say, I'm so sorry, but politics -- terrible politics,

> or discrimination so much that it's really frustrate me terribly -- affected me.
> . . . [¶] I am still dealing with a lot of PTSD[.] . . . [¶] I told you it affected
> me, unfortunately, after being so mistreated at work; I had extreme fear and
> anxiety that it hold me back to get even close to that environment. . . . I have
> extreme phobia; I have extreme anxiety around these people.

(AR 59-60.) She also testified that while she felt she was "too old to . . . start over," she was hoping to return to college to get her degree because "if I'm not able to get back to work, then I have to do something with my life, and possibly I would be by trying[.]" (AR 61.)

Plaintiff submitted two function reports dated September 8 and November 1, 2020, respectively. (AR 204-11, 238-45.) In these reports, Plaintiff indicated that she was unable to work because she had trouble concentrating, experienced memory problems, and had fatigue from poor sleep patterns. (AR 204.) She was "unable to focus" and felt a "lack of motivation" with respect to her hobbies and interests. (AR 208.) She described having problems getting along with family, friends, neighbors, and others because she did not have much patience with people. (*Id.*) She had become more isolated since the onset of her disabling condition, but also noted that she had not gone anywhere on a regular basis for the prior six months due to COVID-19. (*Id.*) She wrote that she spent most of her time in her apartment and took several naps a day because sleep served as a coping mechanism. (AR 238.) She indicated that at times she was "very slow due to lack of energy [and] low mood." (*Id.*)

In her first report, Plaintiff checked off only one ability—concentration—as being affected by her condition. (AR 209.) In her subsequent report, completed just two months later after the initial denial of her claim, Plaintiff checked off seven abilities impacted by her condition: memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (AR 243.) Additionally, in her initial function report, Plaintiff stated that she got along with authority figures "pretty

well" and had never been fired or laid off from a job because of problems getting along with other people. (AR 209.) In contrast, Plaintiff's subsequent function report indicated that she avoided authority figures as much as possible and had been laid off by Blue Shield of California because of problems getting along with other people. (AR 243.) She indicated that she had been "bullied a lot" there and was "laid off unfairly [and] in a very abusive way." (*Id.*)

### 3.   ALJ's findings regarding Plaintiff's subjective symptom testimony

The ALJ's formulation of Plaintiff's residual functional capacity, in which he found that Plaintiff could perform a full range of work at all exertional levels but could have only "contact with others [that is] casual and not more than occasional" and could not work in a setting that includes "constant/regular public contact or more than occasional handling of customer complaints," reflects that he did not reject Plaintiff's allegations in their entirety. (*See* AR 38.) Rather, he discounted them. In so finding, the ALJ determined that Plaintiff satisfied step one of the two-step analysis by finding that her medically determinable impairments could reasonably be expected to cause some of her alleged symptoms. (AR 39.) At the second step, the ALJ found that Plaintiff's testimony regarding intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.*) He explained:

> [T]he claimant has significantly full activities of daily living. She has only non-exertional limitations and restrictions. However, even in her *Function Report*, and the *Adult Third Party Function Report*,[5] the claimant was able to handle most non-exertional tasks such as multi-step tasks (cooking full meals for two to three hours per day),[6] driving, being able to go out alone,

---

[5] Plaintiff's friend, Farshen S., completed an Adult Third Party Function Report on Plaintiff's behalf. (AR 192-99.)

[6] Plaintiff's function report actually indicates that she cooked for one to two hours per day. (AR 206, 240.)

9

shopping in stores for groceries, clothes and household necessities, and handling all of her personal and household finances. While she has reported problems getting along with others, she reported that she communicated with others in almost every modality including being able to handle ZOOM meetings.

In fact, she enjoyed personal contact such as chatting and having tea, as well as going for walks. The claimant was able to concentrate, attend, and persist as noted by her hobbies of watching documentaries and doing needlework. Moreover, she has reported in her records that she has thought about returning to college. Accordingly, after a thorough review of the record as a whole, the undersigned found the above-reference[d] mental residual functional capacity to be consistent with the record as a whole, including the testimony given at the hearing and, therefore, appropriate. The undersigned has taken both of these Reports into consideration, noting [that] the claimant's subjective allegations were not always consistent with the medical evidence of record, nor could they always be supported by the record as a whole, or specific evidence. That said, the claimant's subjective allegations appeared to outweigh the objective medical data, or overall evidence of record.

(*Id.*)

### 4. Analysis

#### a. Daily activities

An ALJ may properly consider the claimant's daily activities in evaluating subjective symptom testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002); *see also* 20 C.F.R. § 404.1529(c)(3)(i) (claimant's daily activities relevant to evaluating symptoms); SSR 16-3p, 2017 WL 5180304, at *7 (same). Daily activities may form the basis of an adverse credibility determination when evidence concerning the claimant's daily activities contradicts his or her testimony, or when the activities meet the threshold for full-time work. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *see also Smith v. Kijakazi*, 14 F.4th 1108, 1114 (9th Cir. 2021). "One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir.

1   2001) (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Nevertheless, "[e]ven

2   where [a claimant's] activities suggest some difficulty functioning, they may be grounds

3   for discrediting the claimant's testimony to the extent that they contradict claims of a

4   totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012)

5   (citations omitted) (superseded on other grounds by 20 C.F.R. § 404.1502(a) (2017)); *see*

6   *also Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014) ("Engaging in daily

7   activities that are incompatible with the severity of symptoms alleged can support an

8   adverse credibility determination.").

9         Describing her daily activities, Plaintiff listed cooking, paying bills, shopping,

10  walking, joining "self-improvement" Zoom meetings, and reading. (AR 205.) She

11  reported spending one to two hours a day preparing Mediterranean food, and her

12  household chores included driving, cleaning, reading, and learning. (AR 206.) She was

13  able to go out alone, and handled her own grocery, clothing, and household shopping.

14  (AR 207.) She was also able to pay her own bills and handle finances. (*Id.*) Her hobbies

15  and interests included watching documentaries, walking, sewing, and needlework. (AR

16  208.) Her social activities included interacting with others in person and on the phone,

17  email, text, and video chats, such as Zoom. (*Id.*) She would "have tea [and] chat" or take

18  walks with others. (*Id.*) Citing Plaintiff's responses, the ALJ concluded that Plaintiff had

19  "significantly full activities of daily living" despite her limitations and found this

20  undermined her subjective symptom testimony. (AR 39.)

21        Plaintiff contends that her daily activities did not constitute a clear and convincing

22  reason to discount her subjective complaints because her "'sporadic activities' do not

23  contradict her testimony nor do they demonstrate an ability to spend a substantial part of

24  the day doing activities transferable to a full-time work setting." (Joint Mot., ECF No. 20

22-cv-1729-BGS

at 12.)[7] But as the ALJ explained, Plaintiff's statements about her social interactions, including "communicat[ing] with others in almost every modality including being able to handle ZOOM meetings," were inconsistent with her reported problems with getting along with others. (AR 39.) Likewise, the ALJ found that Plaintiff's preparation of Mediterranean foods daily for one to two hours a day and watching documentaries contradicted her statement that she could only pay attention for ten to twenty minutes at a time. (AR 37, citing AR 209.) The ALJ further observed that Plaintiff's ability to perform "multi-step tasks such as driving, cooking, cleaning, household work, reading, and 'learning,'" among other activities, supported only a mild limitation in Plaintiff's ability to understand, remember, or apply information. (AR 37.) The ALJ could reasonably conclude that Plaintiff's daily activities contradicted her testimony that she was incapable of working.

Plaintiff argues further that the ALJ "made no effort to state how [Plaintiff's daily activities] relate to the ability to perform work activity." (Joint Mot., ECF No. 20 at 14.) This argument ignores that an ALJ may rely on a claimant's daily activities to discount subjective symptom testimony when evidence concerning the claimant's daily activities contradicts the claimant's testimony *or* when the activities meet the threshold for full-time work. *See Orn*, 495 F.3d at 639. Thus, the ALJ was not required to provide an explanation connecting Plaintiff's daily activities to the requirements of full-time work if, as here, her daily activities contradicted her testimony that she was disabled.

The ALJ also determined that Plaintiff's plan to return to college was inconsistent with her subjective allegations. (AR 39.) Plaintiff does not contest this finding. An ALJ may properly rely upon a return to school to discount a claimant's allegation of disability.

---

[7] Plaintiff's initial arguments regarding the sufficiency of the ALJ's decision are boilerplate and present an inaccurate characterization of the decision. (*See* Joint Mot., ECF No. 20 at 8-11.) Thus, they will not be addressed by the Court.

22-cv-1729-BGS

*See Johnson v. Colvin*, 671 F. App'x 519, 520 (9th Cir. 2016) ("[M]atriculating in basic college classes [along with other daily activities is] clearly inconsistent with the notion that [claimant] could not work at all."); *Lindquist v. Colvin*, 588 F. App'x 544, 546 (9th Cir. 2014) (providing that enrollment in community college evidenced that the claimant's limitations were not as pronounced as his testimony suggested). Here, the record demonstrates that Plaintiff planned to return, and indeed returned, to college. During her March 20, 2020 appointment, at beginning of COVID-19 pandemic, Plaintiff reflected to Dr. House, her psychologist, "that this [was] a good time for her to identify a school program and degree to focus on." (AR 291.) Dr. House's notes further stated, "Client noted how she wants to get a degree that will allow her to make a decent income, which she identified as $22 an hour. She would also like it to be relatively quick and in a field that she wants to work." (*Id.*; *see also* AR 288, 289, 290 (reflecting that Plaintiff sent her transcripts to several schools for evaluation); AR 287 (Plaintiff reported that she had applied to two California state schools, San Marcos and San Francisco); AR 328 (Plaintiff advising that she had been accepted into San Francisco State University ("SFSU")); AR 694, 696, 766 (indicating that Plaintiff had registered for classes at SFSU); AR 825 (Plaintiff reporting that she had started school).

Plaintiff's daily activities, including her return to college, constituted clear and convincing reasons for the ALJ to discredit her testimony regarding her subjective symptoms.

> **b.   Inconsistency with the medical evidence and record as a whole**

An ALJ is directed to consider all of the evidence in a claimant's record when evaluating the individual's symptom testimony. SSR 16-3p, 2017 WL 5180304, at *1. This includes objective medical evidence as well as statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms. *Id.* at *5, 6. Although an ALJ may not disregard a claimant's testimony

1   "solely because it is not substantiated affirmatively by objective medical evidence,"

2   (*see Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), the ALJ may

3   consider whether the alleged symptoms are consistent with the medical evidence as one

4   factor in his evaluation. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007).

5   "When objective medical evidence in the record is inconsistent with the claimant's

6   subjective testimony, the ALJ may . . . weigh it as undercutting such testimony." *Smartt*,

7   53 F.4th at 498; *see also Carmickle v. Comm'r*, 533 F.3d 1155, 1161 (9th Cir. 2008)

8   ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's

9   subjective testimony.") (citation omitted).

10         Here, the ALJ additionally discounted Plaintiff's symptom allegations because

11   they were "not always consistent with the medical evidence of record, nor could they

12   always be supported by the record as a whole, or specific evidence." (AR 39.) To support

13   this conclusion, the ALJ determined that, as found by the state agency physicians, Dr.

14   House's treatment notes did not reveal severe psychopathology. (AR 40, referring to AR

15   72, 83.) The Court's independent review of Dr. House's treatment records confirms that

16   substantial evidence supports the ALJ's determination. Notably, Dr. House's reports are

17   replete with statements from Plaintiff indicating that she had reasons for not wanting to

18   work that were unrelated to disability. For example, Dr. House reported, "Client

19   expressed her interest in getting a job, but railed against the inhumanity of corporations

20   that don't care about employees." (AR 312; AR 297 (Plaintiff again discussing her belief

21   that companies are not "ethical and humane".); *see also* AR 302 ("We also discussed her

22   thoughts about getting a job for [or] just going on disability. Client described the

23   advantages of not having to put up with the problem[s] . . . that jobs involve, having the

24   time to do what she wants to do, and being more available to meet someone who she

25   might get into a relationship with."); AR 292 ("She described being unsure whether she

26   should pursue getting a job, returning to school, or trying to get in a relationship. . . .

27

28

22-cv-1729-BGS

Client tangented to describing how she doesn't want to work for any Americans because they're all lazy or incompetent."); AR 275 ("We returned to processing client's wondering if she would ever be able to get a job that she is able to feel respected and succeed in.")

Additionally, the record contains evidence that Plaintiff was looking for work during the disability period, which undermines her testimony that her symptoms rendered her unable to work. *See Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988) (affirming ALJ's adverse credibility finding based in part on claimant's holding himself out as available for work); *see also* AR 311 ("Client began by describing a job interview she had today. She was disappointed to learn that the business is much bigger than she had thought, as she wants to work for a small company, hoping she would be treated better. Client wondered how long she should continue to look for work."); AR 308 ("Client described her frustration about a lost job opportunity due to not seeing an email in her Spam folder that was time sensitive. This led to a return to her railing against the inhumane capitalist system. . . . She continued to express her resentment of corporate America, mentioning her interest in being able to work for herself."); AR 305 ("She began by stating that she has had several job interviews in the past week . . . [With respect to the particular place she interviewed,] "[s]he did not like the low pay, and wondered if it was worth it, compared to what she would get on disability."); AR 304 (Plaintiff "stated that it was likely she was going to be offered one job but she turned it down due to the low pay."); AR 827 ("Client stated that she has continued to apply for jobs but gets no response."); AR 818 ("Client wondered whether she can work if she receives disability money.").

Based on the foregoing, the Court concludes that the ALJ articulated clear and convincing reasons for discounting Plaintiff's testimony regarding her subjective symptoms, and his finding was supported by substantial evidence.

**B.    Lay Witness Testimony**

Plaintiff's second argument is that the ALJ failed to articulate legally sufficient reasons to reject lay witness testimony from her friend, Farshen S. (Joint Mot., ECF No. 20 at 24-30.) Defendant contends that the revised 2017 regulations do not require an ALJ to articulate his consideration of lay witness evidence. (*Id.* at 30-33.) The Court agrees with Defendant.

**1.    Friend's lay testimony**

Plaintiff's friend completed an Adult Third Party Function Report form on behalf of Plaintiff on September 8, 2020. (AR 192-99.) She wrote that Plaintiff suffered from PTSD and visited her therapist every week. (AR 192.) She stated that Plaintiff had told her that she has nightmares. (AR 193.) The friend further related that Plaintiff's hobbies and interests included walking, cooking, and being creative, but she sometimes suffered a lack of motivation to engage in these activities. (AR 196.) She said that Plaintiff's concentration and understanding were affected by her PTSD, and that Plaintiff "does not pay attention to details" and "loses patience easily." (AR 197.) The friend also explained that Plaintiff had a hard time trusting authority figures, got agitated easily, and had a hard time adapting to change. (AR 198.)

**2.    Analysis**

Plaintiff, relying on *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993), 20 C.F.R. § 404.1513(a)(4), and other authorities, contends that the ALJ was required to articulate "germane reasons" to disregard Plaintiff's friend's lay witness testimony. (Joint Mot., ECF No. 20 at 24-30.) In *Dodrill*, the Ninth Circuit, applying pre-2017 regulations, required ALJs to "give reasons that are germane to each witness" to discount the testimony of lay witnesses. *See Dodrill*, 12 F.3d at 919. Under the revised 2017 regulations, however, the ALJ is "not required to articulate how [he] considered evidence

from nonmedical sources[.]" 20 C.F.R. § 404.1520c(d). [8] "Nonmedical sources" include the claimant, family members, and friends. *Id.* § 404.1502(e). Rather, an ALJ is required only to consider evidence from nonmedical sources in evaluating a claimant's disability claim. *See* 20 C.F.R. § 404.1513(a)(4). Like other district courts considering this issue, this Court finds that the revised regulations plainly allow for the ALJ to render a decision on a plaintiff's disability claim without articulating findings regarding lay witness statements, so long as the witness testimony has been considered. *See, e.g.*, *Mary M. v. Kijakazi*, Case No. 20-cv-1457-AGS, 2022 WL 891445, at *6 (S.D. Cal. Mar. 25, 2022) ("The Court concludes that ALJs are not required to articulate specific reasons for their findings about the persuasiveness of nonmedical-source testimony, and instead must merely show that they considered such evidence in deciding the claim."); *Schilling v. Comm'r of Soc. Sec.*, Case No. 1:21-cv-01268-SAB, 2022 WL 17418343, at *14 (E.D. Cal. Dec. 5, 2022) ("[T]he new regulations do not support a requirement that the ALJ articulate 'germane reasons' for rejecting lay witness testimony, but only a requirement that the lay testimony was 'considered.'"); *but see Sarah B. v. Comm'r of Soc. Sec.*, Case No. 2:23-CV-564-DWC, 2023 WL 7126580, at *2 n.2 (W.D. Wash. Oct. 30, 2023) ("The revised regulations expressly did not change requirements governing ALJs' assessments of lay witness testimony."). [9]

---

[8] For claims filed before March 27, 2017, the requirements for evaluating opinion evidence was set forth in 20 C.F.R. § 404.1527. Unlike the revised regulation, the pre-2017 regulation specifically required the ALJ to articulate his consideration of nonmedical sources. *See* 20 C.F.R. 404.1527(f)(2) ("The adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning[.]").

[9] The Ninth Circuit has not specifically addressed whether the ALJ is still required under the revised regulations to provide germane reasons for discounting lay witness testimony. *Stephens v. Kijakazi*, No. 22-35998, 2023 WL 6937296, at *2 (9th Cir. Oct. 20, 2023).

In this case, the ALJ, in his assessment of Plaintiff's subjective symptom statements, referred to Plaintiff's friend's third-party adult function report twice in conjunction with Plaintiff's function report. (AR 39.) He specifically indicated that he had taken both reports into consideration. (*Id.*) This was sufficient under the revised regulations.

Moreover, even if the ALJ was still required to articulate how he evaluated the lay witness testimony, any failure to do so constituted harmless error. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) ("harmless error . . . exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination") (internal quotation marks and citation omitted). Plaintiff's friend's statements largely restated Plaintiff's own statements about her subjective symptoms. When a lay witness's testimony is similar to a claimant's subjective complaints, the ALJ's analysis of the latter is equally available to the former. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (finding that the ALJ provided germane reasons for rejecting third-party witness testimony similar to the claimant's subjective testimony when the ALJ provided clear and convincing reasons for rejecting the claimant's subjective testimony). As discussed above, the ALJ provided legally sufficient reasons to discount Plaintiff's subjective complaints. These reasons would equally apply to the lay witness testimony contained in the third-party adult function report.

## IV.   CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED**. The Clerk is directed to issue a judgment and close this case.

**IT IS SO ORDERED**.

Dated:  January 2, 2024

Hon. Bernard G. Skomal
United States Magistrate Judge

18

22-cv-1729-BGS